AO 91 (REV.5/85) Criminal Complaint

AUSA RENAI S. RODNEY (312) 353-4064
AUSA LELA JOHNSON (312) 353-4320

FILED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

JUL 0 8 2008 NH

MAGISTRATE JUDGE COLE

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JACQUE BUCKLEY, also known as, "Jay," and
ROBERT JOYNER, also known as, "Bear"

Under Seal

CRIMINAL COMPLAINT

CASE NUMBER: 08CR 532

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about March 5, 2007, until at least April 25, 2007, in Will county, in the Northern District of Illinois defendant(s) did, (Track Statutory Language of Offense)

conspired with each other and others, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely, 50 grams or more of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21 United States Code, Section(s) 846.

I further state that I am a(n) Special Agent (Official Title) and that this complaint is based on the following facts:

Continued on the attached sheet and made a part hereof: X Yes ___ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

July 8, 2008 at Chicago, Illinois

Date | City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS )
)
COUNTY OF COOK )

## AFFIDAVIT

I, Larry L. Lapp, being duly sworn, depose and state:

## I. Introduction

1. I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed for eight years. I am currently assigned to the Criminal Enterprise Squad, which investigates criminal activity of street gang members in Aurora, Illinois and surrounding communities. As part of my current assignment, I investigate criminal violations of the Controlled Substances Act found in Title 21 of the United States Code, as well as related violations found in Title 18 of the United States Code. I have participated in investigations of narcotics-related offenses involving the possession, sale, and distribution of cocaine, heroin, and crack cocaine in Aurora and its surrounding communities. Based on my training and experience, I am familiar with the ways in which individuals conduct their narcotics-related activities, including, but not limited to their (a) methods of distributing narcotics, (b) use of telephone communication devices, and (c) use of code words to identify themselves, the nature of the communication, and to conduct their drug-related transactions.

2. The following information is based upon my personal observations and knowledge, my participation in this investigation, information I have received from other federal agents and local law enforcement officers, information provided to law enforcement by a confidential witness, information provided to law enforcement by other witnesses, and consensually recorded conversations. To the extent that recorded conversations are summarized below, those summaries

do not include references to all of the topics covered during the course of the conversation that was recorded. In addition, the summaries do not include references to all statements made by the speakers on the topics that are described. At various points in this Affidavit, I have placed my understanding of what was being said during those calls in parentheses. My understanding is based on the content and context of the conversations, my experience as a law enforcement agent, and the experience of other law enforcement agents and officers involved in this investigation.

**II. Summary of Probable Cause**

3. This Affidavit is submitted for the limited purpose of establishing probable cause in support of the attached complaint which charges JACQUE BUCKLEY, a/k/a "Jay" ("BUCKLEY")[1] and ROBERT JOYNER, a/k/a "Bear ("JOYNER"), with conspiring with each other and others, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance in violation of Title 21, United States Code, Section 846.

4. In particular, as further set forth below, a confidential witness ("CW3") and an undercover employee ("UCE2") working with the FBI completed a controlled purchase from BUCKLEY and JOYNER of 51.4 grams of crack cocaine on March 5, 2007; UCE2 completed a controlled purchase of crack cocaine from BUCKLEY and JOYNER of 37.3 grams of cocaine base on March 29, 2007; and a controlled purchase from BUCKLEY of 46.5 grams of cocaine base on April 25, 2007. I have not included each and every fact known to me concerning the individuals or

[1]On December 19, 2007, BUCKLEY was convicted of Possession of a Controlled Substance in Kane County, Illinois, and sentenced to 124 days of imprisonment and 24 months' probation. As of the date of this affidavit, BUCKLEY is not in custody.

the events described in this Affidavit.

## II. Facts Establishing Probable Cause

5. In or around February 2007, Individual B informed FBI agents that CW3 would be willing to cooperate on Individual C's behalf. FBI agents met with CW3 and s/he agreed to cooperate with the FBI in exchange for a recommendation for possible reduction in Individual C's federal prison sentence. While no formal agreement has been reached, CW3 has been advised that if his/her cooperation is significant, the government will file a Rule 35 motion with Individual C's sentencing court to seek a reduction of Individual C's sentence based on CW3's cooperation. In addition to consideration given to Individual C regarding his/her sentence, between February and March 2007, the FBI paid CW3 approximately $1,463 to cover his/her food and living expenses. In 2004, CW3 was convicted of forgery twice and of manufacturing and delivery of more than 500 grams of cannabis once.

6. From February through March 2007, CW3 provided information to the FBI concerning BUCKLEY and JOYNER. A substantial portion of CW3's information regarding these individuals has been corroborated by independent investigation that includes surveillance, consensually recorded conversations and telephone record analysis.

*a. March 5, 2007 Controlled Purchase*

7. On March 5, 2007, at approximately 12:19 p.m., at the direction of FBI agents, CW3 made a consensually recorded phone call to BUCKLEY[2] at (603) 405-9306 (Buckley Phone

[2]The identification of BUCKLEY in this Affidavit is based upon the following: CW3's identification of BUCKLEY from a State of Illinois Driver's License photograph as the individual s/he knew as "Jay." Agents' identification of BUCKLEY's voice during consensually recorded telephone calls between BUCKLEY and CW3 and between BUCKLEY and UCE2 in which BUCKLEY identified himself in those calls as "Jay" or "Jacque." In addition, BUCKLEY's voice

A)[3] to ask if he was "ready" (prepared to sell CW3 quantities of crack cocaine). BUCKLEY responded that he was talking to his "guy" (drug supplier) on the other line. CW3 told BUCKLEY that his/her friend was bringing a scale so "it" (crack cocaine) had to "weigh out" (measure two ounces). BUCKLEY told CW3 not to worry about it and said, "I got you."

8. Later that same day, at approximately 1:26 p.m., CW3 made another recorded call to BUCKLEY at Buckley Phone A. During this conversation, BUCKLEY told CW3 that his "guy" (drug supplier) said it would be another 30 minutes because he had to "cook it" (make powder cocaine into crack cocaine). After the call ended, agents searched CW3 for cash, drugs, and any other contraband with negative results, and then equipped CW3 with a recording device and a transmitter. Also participating in this operation was an FBI employee ("UCE2") who was posing as a drug dealer looking to obtain quantities of crack cocaine for re-sale. Agents equipped UCE2 with a recording device and provided him/her with $1600 in undercover funds. Surveillance units then followed UCE2 and CW3 as they drove in UCE's vehicle to a Target store parking lot in North Aurora.

9. At approximately 2:28 p.m., CW3 called BUCKLEY on Buckley Phone A. During this conversation, CW3 told BUCKLEY that UCE2 wanted to do the deal at the Target store where CW3 and UCE2 were waiting. After some discussion, UCE2 agreed to meet BUCKLEY at a residence at 455 Spruce Street in Aurora ("the residence"). Surveillance then followed CW3 and

---

UCE2, and the individual CW3 identified as BUCKLEY was observed by surveillance units during these meetings.

[3]According to Sprint records, Buckley Phone A belongs to JACQUE LEMAR BUCKLEY, 1335 East Wilson Street, Batavia, Illinois, 60519-2276. The account for this phone was activated on January 24, 2007.

UCE2 as they drove to this location.

10. When they arrived at the residence, CW3 went inside the residence while UCE2 remained in his/her vehicle. While UCE2 waited, surveillance observed JOYNER[4] drive up to the residence in a silver Chevy Monte Carlo, license plate number 8814878.[5] Surveillance saw JOYNER get out of his vehicle and begin talking to UCE2. During their conversation, which was recorded, JOYNER told UCE2 that he had eleven kids and "that's why I do what I do" (sell drugs).

11. While UCE2 was talking to JOYNER, CW3 came out of the residence with BUCKLEY, whom s/he introduced to UCE2. BUCKLEY told UCE2 that his "guy" (drug supplier) had got caught by the train but that he would be there soon. BUCKLEY and JOYNER went inside the residence, and CW3 and UCE2 waited outside in UCE2's vehicle. A few minutes later, surveillance saw a black male park a red Dodge, license plate number 265 6938 across the street from the residence. This individual got out of the Dodge and entered the residence through a side door. UCE2 and CW3 then entered the residence through the front door.

12. According to CW3, UCE2, and a review of the recordings, the following took place: (a) inside the residence, BUCKLEY weighed the crack cocaine on a scale and told UCE2 that "it's all here" (two ounces of crack cocaine); (b) BUCKLEY then asked UCE2 if s/he knew how to "bag it up" (package crack cocaine for sale); (c) BUCKLEY explained to UCE2 that because s/he was new

---

[4]The identification of JOYNER in this Affidavit is based upon the following: CW3's identification of JOYNER from a State of Illinois Driver's License photograph as the individual s/he knew as "Bear." Agents' identification of JOYNER's voice during consensually recorded meetings between JOYNER, CW3, and UCE2 when JOYNER identified himself as "Bear." During these meetings, surveillance units also observed the individual CW3 identified as JOYNER.

[5] According to my review of the records of the Illinois Secretary of State, license plate number 8814878 is registered to Jacque Buckley, 1335 East Wilson Street, Batavia, Illinois, 60510.

(to drug sales) "the best way to get it started is take a piece off, off of each one (crack cocaine) and put it on the scale like 3.0 (grams) and bag a little dime bags 100, I mean 200" (make $200 off of each bag of crack cocaine); (d) JOYNER then asked UCE2 if s/he knew how much money s/he was supposed to make off two ounces; (e) BUCKLEY explained to UCE2 that if s/he did it in "eight balls" (packaged crack cocaine in amounts of an eighth of an ounce) s/he would make $2000; (f) UCE2 then gave BUCKLEY the $1600, which BUCKLEY counted by placing the money in piles of $100 each; (g) BUCKLEY then handed UCE2 a plastic bag containing the suspected crack cocaine; and (h) at this point, UCE2 and CW3 left the residence to meet agents at the briefing location where UCE2 turned over a whitish, hard, rock-like substance, suspected to be crack cocaine s/he purchased from BUCKLEY and JOYNER.[6]

13. Agents submitted the suspected crack cocaine UCE2 had purchased from BUCKLEY and JOYNER to the DEA Crime Lab for analysis, the results of which showed the substance to be 51.4 grams of cocaine base. In addition, the results showed that the substance contained Sodium Bicarbonate, a common cooking agent found in cocaine base, and Hydroxyzine, a common mixing agent found in cocaine and cocaine base. Based upon your Affiant's experience, the whitish, rock-like appearance, and the lab results, your Affiant believes the substance UCE2 bought from BUCKLEY and JOYNER was crack cocaine.

*b. March 29, 2007 Controlled Purchase*

14. On March 13, 2007, at approximately 9:54 a.m., UCE2 made a consensually recorded phone call to BUCKLEY at Buckley Phone A. During their conversation, BUCKLEY asked UCE2

---

[6] After the controlled drug purchase, UCE2 was shown driver's license photographs of JOYNER and BUCKLEY. After viewing the photographs, UCE2 identified JOYNER and BUCKLEY as the two individuals s/he met at 455 Spruce Street.

if "that" (crack cocaine UCE2 purchased from BUCKLEY and JOYNER on March 5, 2007) "worked out" for him/her. UCE2 told BUCKLEY that it had and that s/he had a little left. UCE2 then told BUCKLEY that s/he was looking to get something (crack cocaine) next week and that s/he would call him then. In response, BUCKLEY told UCE2 that he would be "right" (ready to sell crack cocaine) when s/he called.

15. On March 22, 2007, at approximately 1:27 p.m., UCE2 attempted to make a consensually recorded phone call to BUCKLEY at Buckley Phone A, but BUCKLEY did not answer. At approximately 1:29 p.m. that same day, BUCKLEY called UCE2 back from Buckley Phone A. During this conversation, which was consensually recorded, UCE2 asked BUCKLEY if s/he could "holler" at BUCKLEY next Thursday since s/he gets paid on that day (meet up with BUCKLEY to purchase crack cocaine). BUCKLEY told UCE2 to "holler" at him whenever s/he was ready. When UCE2 asked if s/he could get "two" (two ounces of crack cocaine), BUCKLEY responded, "You can get 20 of them if you want it." At the end of their conversation, UCE2 told BUCKLEY that s/he would "holler" at him the following week.

16. On March 29, 2007, at approximately 2:30 p.m., UCE2 attempted to make a recorded phone call to BUCKLEY at Buckley Phone A and received a voicemail message directing callers to call him at (630) 862-1726 (Buckley Phone B). UCE2 then attempted to make a recorded phone call to BUCKLEY at Buckley Phone B but there was no answer. UCE2 left a voicemail message asking BUCKLEY to call him/her back. At approximately 2:34 p.m., BUCKLEY called UCE2 back from Buckley Phone B. During their conversation, which was consensually recorded, UCE2 asked BUCKLEY if he was "ready" for him/her (to sell UCE2 crack cocaine). BUCKLEY told UCE2 that he was going home to "shake this shit up" (turn powder cocaine into crack cocaine) for UCE2.

UCE2 and BUCKLEY then agreed to meet at the North Aurora Denny's Restaurant in North Aurora, Illinois twenty minutes later.

17. Law enforcement agents equipped UCE2 with a recording device and transmitter and provided him/her with $2000 in undercover funds. Surveillance followed UCE2 as s/he drove to the Denny's parking lot at the 400 block of South Lincolnway in North Aurora. After UCE2 arrived at this location, s/he called BUCKLEY on Buckley Phone C at approximately 2:59 p.m. During this conversation, BUCKLEY told UCE2 that his "guy" (drug supplier) was in Batavia, and that he (BUCKLEY) had told him yesterday to have "it" (crack cocaine) ready. BUCKLEY ended the conversation by telling UCE2 that it would be about twenty more minutes. At approximately 4:31 p.m., BUCKLEY called UCE2 from Buckley Phone C. During this conversation, BUCKLEY told UCE2 that "Bear" (subsequently identified as ROBERT JOYNER) was going to bring "it" (crack cocaine) to UCE2 at the Denny's parking lot and that Bear would be driving a silver Chevy Monte Carlo.

18. At approximately 4:34 p.m., surveillance saw a silver Chevy Monte Carlo, license plate number 8814878[7], arrive at the Denny's parking lot. Agents then observed JOYNER get out of his vehicle and enter UCE2's vehicle. According to UCE2 and a review of recordings, once JOYNER entered UCE2's vehicle, UCE2 asked JOYNER, "How much we got here, do you know?" (amount of crack cocaine), and JOYNER responded, "No I don't." After UCE2 asked if it was "two" (two ounces), JOYNER said "yes, two." JOYNER then gave UCE2 a clear plastic bag containing the suspected crack cocaine, and UCE2 gave JOYNER the $2000. JOYNER left UCE2's

[7] According to my review of the records of the Illinois Secretary of State, license plate number 8814878 is registered to Jacque Buckley, 1335 East Wilson Street, Batavia, Illinois, 60510.

vehicle and UCE2 drove out of the parking lot. UCE2 met agents at the briefing location where UCE2 turned over a whitish, hard, rock-like substance, the suspected crack cocaine s/he purchased from JOYNER and BUCKLEY.

19. Agents submitted the suspected crack cocaine JOYNER delivered to UCE2 to the DEA's Crime Lab for analysis, the results of which showed the substance to be 37.3 grams of cocaine base. In addition, the results showed that the substance contained Diltizaem, a common mixing agent found in cocaine and cocaine base. Based upon your Affiant's experience, the whitish, rock-like appearance, and the lab results, your Affiant believes the substance UCE2 bought from BUCKLEY and JOYNER was crack cocaine.

*c. March 29, 2007, Consensual Phone Call Between UCE2 and BUCKLEY*

20. Because UCE2 received less than two ounces of crack cocaine for $2000 instead of the two ounces (approximately 56 grams) that s/he was promised by BUCKLEY, UCE2 called BUCKLEY. On March 29, 2007, at approximately 5:39 p.m., UCE2 made a consensually recorded phone call to BUCKLEY at Buckley Phone B and told him that s/he had received only 40 grams for $2000. BUCKLEY explained that he (BUCKLEY) only had "1" (one ounce of crack cocaine), and since UCE2 wanted more, he had asked "him" (JOYNER) to do it for him. BUCKLEY also told UCE2 that he was going to "look out" for him/her for "free" the next time (make up for the shortage for no extra charge during UCE2's next drug purchase). BUCKLEY ended the conversation by telling UCE2 to call him.

*d. April 25, 2007 Controlled Purchase*

21. On April 25, 2007, at approximately 1:51 p.m., UCE2 attempted to make a recorded phone call to BUCKLEY at both Buckley Phone A and Buckley Phone B. Both phones went directly

to voice mail, so UCE2 left a message asking BUCKLEY to call him/her back. At approximately 2:38 p.m., BUCKLEY called UCE2 from phone number (630) 886-4766, (Buckley Phone C). During this conversation, which was consensually recorded, BUCKLEY asked UCE2 if s/he was still trying to get "that" (crack cocaine). UCE2 said, "yes," and told BUCKLEY that s/he had "enough" (money) for "two" (two ounces of crack cocaine). BUCKLEY asked UCE2 how much, and UCE2 told him that s/he had $1400. BUCKLEY first told UCE2 that s/he needed "one more dollar" ($100), then BUCKLEY said he would give it to UCE2 for the "14" ($1400). BUCKLEY told UCE2 that s/he would have to give him a few minutes so he could "whip it up for him/her real quick" (cook powder cocaine into crack cocaine). UCE2 asked BUCKLEY how long, and he told him/her that it would take about 30 minutes.

22. At approximately 3:05 p.m., UCE2 made a consensually recorded phone call to BUCKLEY at Buckley Phone C. During this conversation, BUCKLEY told UCE2 that "dude" (drug supplier) told him it would be about an hour. When UCE2 began to complain that s/he had called BUCKLEY previously,[8] BUCKLEY told UCE2 that he knew that, but "motherfuckers don't be holdin' it" (drug suppliers do not keep the crack cocaine in their possession for long). BUCKLEY then explained to UCE2 that he was waiting on his "guy" (drug supplier) to come back, so he could buy some "shit" (crack cocaine). UCE2 and BUCKLEY then agreed to meet at the North Aurora Denny's Restaurant at 4:00 p.m.

23. Agents equipped UCE2 with a recording device and transmitter and provided him/her

---

[8] On April 24, 2007, BUCKLEY contacted UCE2 from BUCKLEY Phone C. During their conversation, UCE2 told BUCKLEY that s/he could not do a deal that day, but suggested that they try again the following day (April 25, 2007) at 2:00 p.m. When BUCKLEY contacted UCE2, s/he did not have any recording equipment available, therefore, this phone conversation was not recorded.

with $1400 in undercover funds. Surveillance then followed UCE2 to the Denny's parking lot at the 400 block of South Lincolnway in North Aurora where UCE2 arrived at approximately 4:04 p.m. At approximately 4:18 p.m., BUCKLEY arrived at the Denny's parking lot in a silver Chevy Monte Carlo, license number 8814878. BUCKLEY got out of his vehicle and entered the front passenger seat of UCE2's vehicle. Once inside, BUCKLEY explained to UCE2 that some "dudes" (drug suppliers) had been locked up six months ago and it was still "dry out here" (there was a shortage of crack cocaine for sale). Because of this, BUCKLEY explained to UCE2 that "shit takes time," and even though his "guy" (supplier) had the "shit" (crack cocaine) yesterday, his "guy" had to sell this and "re-up" (obtain more drugs) today.

24. At approximately 5:05 p.m., BUCKLEY told UCE2 to follow him. BUCKLEY left UCE2's vehicle and entered his silver Chevy Monte Carlo and drove out of the parking lot. Surveillance observed UCE2 follow BUCKLEY to Copley Park, located at the intersection of South Lake Street and Ridgeway Avenue in Aurora. While UCE2 waited at this location, BUCKLEY told UCE2 that he was going to get "it" (crack cocaine). BUCKLEY drove out of the park. At approximately 5:26 p.m., BUCKLEY called UCE2 from BUCKLEY Phone C. During this conversation, BUCKLEY told UCE2 that it would be another five minutes since he ran out of baking soda (common cooking agent used to change cocaine into crack cocaine).

25. At approximately 6:16 p.m., BUCKLEY pulled his silver Chevy Monte Carlo into the Copley Park parking lot, and then entered the back seat of UCE2's vehicle. During the transaction, which was recorded, BUCKLEY apologized for the wait and told UCE2 to call him during the day time. BUCKLEY handed UCE2 a clear plastic bag containing the suspected crack cocaine and UCE2 gave BUCKLEY the $1400. UCE2 left the park and drove to meet agents at the

cocaine and UCE2 gave BUCKLEY the $1400. UCE2 left the park and drove to meet agents at the briefing location where UCE2 turned over a whitish, hard, rock-like substance, the suspected crack cocaine s/he purchased from BUCKLEY.

26. Agents subsequently submitted the suspected crack cocaine UCE2 had purchased from BUCKLEY to the DEA Crime Lab for analysis, the results of which showed the substance to be 46.5 grams of cocaine base. In addition, the results showed that the substance contained Sodium Bicarbonate, a common cooking agent found in cocaine base. Based upon your Affiant's experience, BUCKLEY's reference to baking soda, the whitish, rock-like appearance, and the lab results, your Affiant believes the substance UCE2 bought from BUCKLEY and JOYNER was crack cocaine.

### III. Conclusion

27. Based on the foregoing, I respectfully submit that there is probable cause to believe that from on or about March 5, 2007 until at least April 25, 2007, JACQUE BUCKLEY and ROBERT JOYNER conspired with each other and others, knowingly and intentionally to possess with intent to distribute and to distribute controlled substances, namely, 50 grams or more of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance in violation of Title 21, United States Code, Section 846.

FURTHER AFFIANT SAYETH NOT.

LARRY L. LAPP
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
this 8th day of July, 2008

Jeffrey Cole
U.S. Magistrate Judge